# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF KENTUCKY
# LOUISVILLE DIVISION

**MICHAEL BENTON**                                                                                **PLAINTIFF**

**v.**                                                       **CIVIL ACTION NO. 3:17-cv-587-BJB**

**LOUISVILLE METRO GOVERNMENT et al.**                       **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now before the Court are the motion for summary judgment filed by Defendants Kiara Bullock and Kevin Smith (DN 41), Defendants' motion to supplement their summary-judgment motion (DN 46), and Defendants' motion to strike (DN 97) Plaintiff's supplemental response and exhibits (DN 96).

## I. MOTION TO STRIKE

Defendants Bullock and Smith first argue that Plaintiff's supplemental response to their summary-judgment motion (DN 96) should be stricken because it was not filed until February 17, 2021, five days after the extended deadline to file a response -- February 12, 2021.

Under Fed. R. Civ. P. 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A motion to strike is a remedy that should be used sparingly and only when the purposes of justice require. *See Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953); *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 801 (E.D. Mich. 2015) ("[C]ourts tend to disfavor motions to strike and they are infrequently granted, because a motion to strike proposes a drastic remedy.") (internal quotation marks and citations omitted).

The Court is not persuaded that Plaintiff's response was filed late. Because Plaintiff is a *pro se* prisoner, the filing date is the date when he gave the document to prison authorities for

mailing, rather than the date when the document was filed in the docket. *Richard v. Ray*, 290 F.3d 810, 813 (6th Cir. 2002) (holding prisoner's "complaint should be deemed timely filed as of the date it was submitted to prison authorities for forwarding to the court clerk pursuant to the mailbox rule"); s*ee also Houston v. Lack*, 487 U.S. 266 (1988). Plaintiff's response certifies that it was mailed in February 2021, but does not provide an exact date; clearly, however, it was presented to prison authorities for mailing before it was filed in the record on February 17. Thus, it may have been filed on or before the February 12 deadline and certainly no more than four days after the deadline. Even if Plaintiff was a few days late in filing, there is no prejudice to Defendants and no showing that justice requires striking the response.

Defendants also argue that two web articles related to eye health attached to Plaintiff's response should be stricken because Plaintiff has not authenticated them.

A motion to strike may be used to strike a pleading, but not an exhibit. *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006); *Rhea v. Dollar Tree Stores*, 395 F. Supp. 2d 696, 702 n.7 (W.D. Tenn. 2005) ("[E]xhibits attached to motions are not pleadings and are outside the scope of Rule 12(f)."). Additionally, under Rule 56, motions to strike summary-judgment exhibits as unauthenticated are no longer appropriate: "[s]uch motions should be construed as objections under Rule 56(c)(2)." As Judge Scoville explained:

> [T]he 2010 amendments to Rule 56 … eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated. Rather, the amended Rule allows a party making or opposing a summary judgment motion to cite … materials in the record including, among other things, "depositions, documents, electronically stored information, affidavits or declarations" and the like. Fed. R. Civ. P. 56(c)(1)(A). If the opposing party believes that such materials "cannot be presented in a form that would be admissible in evidence," that party must file an objection. Fed. R. Civ. P. 56(c)(2). Significantly, the objection contemplated by the amended Rule is not that the material "has not" been submitted in admissible form, but that it "cannot" be. The comments to the 2010 amendments make it clear that the drafters intended to make summary judgment practice conform to procedure at trial. "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to

> show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike." Fed. R. Civ. P. 56 (2010 Advisory Committee comments).

*Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-CV-1144, 2011 WL 5169384, at *2 n.1 (W.D. Mich. Oct. 31, 2011) (footnote omitted).

A statement from a medical textbook, treatise, or professional article may be admissible if the statement comes from a reliable medical authority and is addressed by an expert witness. *See* Fed. R. Evid. 803(18). Even assuming that either of the articles could be shown to be a reliable medical authority, the hearsay exception in Rule 803(18) does not apply because Plaintiff has not shown that he has any medical expertise and has not identified any expert witness who would address any of the articles. *Gibson v. Vanjani*, No. 17-CV-01705-EMC, 2018 WL 4053458, at *9 & n.5 (N.D. Cal. Aug. 24, 2018) (in considering summary-judgment motion, defendants' hearsay objections to the *pro se* plaintiff's use of internet medical articles regarding Hepatitis-C was sustained because the plaintiff was not competent to testify as an expert as to these articles); *Colwell v. Corizon Healthcare Inc.*, No. 11-CV-15586, 2014 WL 6686764, at *7 (E.D. Mich. Nov. 26, 2014) (ruling that *pro se* plaintiff's attempt to "introduce multiple Wikipedia and Medscape articles as evidence" in opposition to prison healthcare defendants' summary-judgment motion was inadmissible hearsay). The Court will not consider the articles in ruling on Defendants' summary-judgment motion because Plaintiff, even accounting for his *pro se* status, hasn't identified any witness who would or could establish these documents' reliability and relevance as evidence. Nor is it clear how the articles would change the summary-judgment analysis below even if they were properly before the Court.

Finally, Defendants alternatively request leave to file a fourth reply. This request appears to be moot, however, because Defendants have since filed a supplemental reply (DN 101). Accordingly, the Court **DENIES** the motion to strike (DN 97).

## II. SUMMARY-JUDGMENT MOTION

**A. Standard of Review.** Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

No "genuine dispute" exists if a reasonable fact-finder could not accept the nonmoving party's version of the facts, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986), or if, even on the nonmoving party's version of the facts, the law would still require a judgment for the movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B. Deliberate Indifference Under the Eighth Amendment.**

The Eighth Amendment protects convicted prisoners from "cruel and unusual punishments." U.S. Const. amend. VIII. An Eighth Amendment claim requires a plaintiff to prove two distinct components, one objective and one subjective. First, the alleged deprivation "must be, objectively, sufficiently serious," *i.e.*, the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1970) (citations and internal quotation marks omitted). Second, the official must have acted with deliberate indifference to the inmate's health or safety, *i.e.*, knew of and disregarded an excessive risk to the inmate's health or safety. *Id*.

In the context of a claim of deliberate indifference related to medical treatment, the Sixth Circuit has explained the requirements of the objective component as follows. "First, the failure to protect from risk of harm must be objectively 'sufficiently serious.' . . . To meet this

4

requirement, [Plaintiff] must show 'the existence of a "sufficiently serious" medical need.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d at 518 (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 897).

A serious medical need alone can satisfy the objective element of a deliberate-indifference claim if the relevant defendant effectively provides no care for it. *See Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) ("[B]ecause a serious medical condition carries with it a serious medical need, when prison officials fail to provide treatment for an inmate's serious medical condition, the inmate has endured an objectively serious deprivation."). To establish the objective element "where doctors provide some care and prisoners challenge their treatment choices as inadequate," however, a prisoner must show that his care was "'so grossly incompetent' or so grossly 'inadequate' as to 'shock the conscience' or 'be intolerable to fundamental fairness.'" *Phillips v. Tangilag*, __ F.4th __, No. 20-6226, 2021 WL 4237164, at *5 (6th Cir. Sept. 17, 2021) (citations omitted); *see also Rhinehart*, 894 F.3d at 737 (similar) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 89 (6th Cir. 2005)).

**C. Allegations and Counterarguments.** Plaintiff's 42 U.S.C. § 1983 complaint alleged that Defendants Bullock and Smith violated his constitutional rights by acting with deliberate indifference to his serious medical need after he was stabbed in the eye in an altercation with

other inmates on October 13, 2016.[1] He also alleged that Defendant Smith was deliberately indifferent by denying him access to his prescription for eyeglasses. DN 1 at ¶ 111.

Defendants' motion for summary judgment argues that they were not deliberately indifferent to Plaintiff's serious medical needs because he received extensive treatment for his October 2016 injury (DN 41). Defendants assert that Plaintiff has offered no medical evidence to contradict these findings. Defendants further argue that Plaintiff's allegations that treatment was delayed or denied omit the fact that Plaintiff refused treatment on multiple occasions. Furthermore, they contend, Plaintiff's mere disagreement with the treatment he received does not rise to the level of a constitutional violation. To the extent Plaintiff asserts treatment was impermissibly delayed, moreover, he has not offered any verified medical evidence by an expert or treating physician that would establish the detrimental effect of the delay. In support of their motion, Defendants attached authenticated copies of relevant medical records (DN 43 and 44).

In response (DN 56), Plaintiff argues that on October 13, 2016, he was "stabbed in the corner of my right eye temporar[i]ly loosing vision," and that Defendant Smith was "unavailable and did not activate a[n] EMS," which "clearly shows the first step of deliberate indifference." DN 56 at 1-2. The nursing eye-complaint form, Plaintiff continues, "is factual proof and a[n] example of Dr. Smith not following Correct Care Solutions procedures." *Id.* Plaintiff also argues that "[i]t took almost a year to get a MRI done of my brain but did [he] not have imaging performed on head or eyes," because an "MRI of my eyes was ordered but not done as instructed." *Id*. at 5-6. Plaintiff further asserts that he was not given a tetanus "shot, head trauma

---

[1] Summary judgment on Plaintiff's federal claims against other Defendants who are employees of the Louisville Metro Department of Corrections (LMDC) has been granted because those claims were not administratively exhausted (DN 106).

evaluation, and nerve damage evaluation by a MRI." *Id*. at 6.  Finally, he asserts that he "caught an infection and had to be placed on Doxycycline." *Id*.

Plaintiff's sur-reply (DN 90) mostly addresses the question of exhaustion, addressed below in footnote 3, but also asserts that "I have permanent nerve damage and wear corrective lenses due to the infection and injury I steadily take medication for."

In their supplemental reply (DN 101), Defendants dispute Plaintiff's "embellish[ed]" descriptions of his injuries, such as claiming he was stabbed *in* the eye when the medical evidence demonstrates that the injury was the right *of* his eye.  DN 101 at 2.  The supplemental reply also points to medical evidence indicating that Plaintiff stated that he regained vision after the fight.  *Id.*  And Defendants point out that no medical evidence supports Plaintiff's need for corrective lenses, allegations of nerve damage, or attribution of migraines to a delay in his treatment.  *Id*.  They further argue that Plaintiff omits that he suffered additional eye injuries in March and April 2017.  *Id*.

### 1. Defendant Smith

The complaint alleged that after Plaintiff was stabbed in his right eye socket during a jail fight on October 13, 2016, he was seen by Defendant Bullock who examined him and determined that he needed hospital treatment for his eye socket injury.  DN 1 at ¶¶ 31, 38, 39.  He further alleged that he was transferred to LMDC's medical wing where Defendant Smith denied him a hospital visit without having examined him.  *Id*. at ¶¶ 39-41.  Plaintiff alleged that he was skipped for sick calls on October 15 but was eventually seen that day by Defendant Smith, who applied bandage strips to the right eye puncture wound.  *Id* at ¶ 50.  He alleged that afterwards he was sent to solitary confinement with almost no medical treatment during which time his wound became infected.  *Id*. at ¶¶ 52-54.  He stated that he was transported to an outside

hospital in November where the treating doctors recommended follow-up treatment with a neurologist and/or his primary care physician for a head scan and further treatment of his eye wound. *Id*. at ¶¶ 55–56. He alleged that he was seen by a neurologist in June 2017. *Id*. at ¶ 57. He also alleged that Defendant Smith was deliberately indifferent by denying him access to his eye prescription. *Id*. at ¶ 111.

Plaintiff's medical records, which he cites and does not rebut with other evidence, indicate that he was seen by Defendant Bullock immediately after the injury. She recorded Plaintiff as stating "that he temporarily lost vision due to blood being in his eye" and that "he regained vision after removal from the fight." She noted that he was "actively bleeding from [] what appears to be a puncture wound next to right eye" and also that his "wound was cleaned and a dressing was applied [while] [a]waiting orders from MD on call." DN 43 at 38. The record demonstrates the following course of treatment by, and at the behest of, Defendant Smith. The day after the injury, Smith ordered Ibuprofen, a prophylactic antibiotic, and vital monitoring for five days. *Id*. at 26. The next day, Plaintiff became agitated and ripped the bandage off. *Id*. at 36. A nurse cleaned and bandaged his wound. *Id*. On October 16, a nurse addressed Plaintiff's request for medical housing explaining that because his eye was healing appropriately, he did not need medical housing. *Id*. at 3-4. On the same date, Plaintiff refused the medications ordered by Defendant Smith. *Id*. at 9. His wound was cleaned again on October 17, and there was no sign of infection. *Id*. at 32. In fact, at his deposition, Plaintiff admitted that he saw a nurse or doctor every day before being sent to an outside facility. DN 41-3 at 82.

The medical records further show that Plaintiff asked to see an ophthalmologist on October 20 and 22. *Id*. at 31, 47. By October 25, Defendant Smith had Plaintiff scheduled for a follow-up examination with him, and Defendant Smith saw him on November 2. *Id*. at 40. Nine

8

days later, at Defendant Smith's request, Plaintiff was taken to University of Louisville Eye Specialists for an ophthalmology evaluation. *Id*. at 13. The handwritten consult sheet for this examination recommended further evaluation to "PCP [primary care physician] or neurologist for migraine headaches. Decision for imaging the brain at PCP/neurologist discretion." *Id*. The formal ophthalmologist report recommended "evaluation by PCP and/or neurologist for migraines" and did not mention an MRI. DN 44 at 6. When Defendant Smith saw Plaintiff for a follow-up on December 9, he determined that "no MRI [was] indicated presently." DN 43 at 39.

On February 4, 2017, Plaintiff asked to be seen for "eye problems and pain." *Id*. at 45. Plaintiff was seen by Defendant Smith on February 9, 2017. *Id*. at 41-42. Plaintiff stated that his right eye had been twitching since October 2016, but Defendant Smith documented that Plaintiff "[h]as been seen by ophthalmology – no real sequelae." *Id*. at 41. Defendant Smith's notes continued: "Complains of headaches week after eye injury . . . behind the right eye, pain characterized as an 'irritation' . . . on average 2 to 3 times weekly. Light makes symptoms worse." Defendant Smith also noted: "Headache – nonspecific. I do not believe this is related to eye laceration in any way." *Id*. at 42. However, Defendant Smith referred Plaintiff to a neurologist, stating, "Can refer to neurology for evaluation of headache but nothing focal on exam. Patient is insistent on imaging because the ophthalmologist mentioned [it] in her report." *Id*. Also, "Pt. declines analgesia."

Defendant Smith further noted that Plaintiff "requests release of eyeglass prescription because the glasses provided are 'too ugly.'" *Id*. at 41. Defendant Smith "[e]xplained to patient that medical department fulfilled its duty by providing corrective lenses (which is, by the way, not caused by his eye laceration) and I am not approving outside glasses because he feels the eyeglasses provided by the medical department are not fashionable enough." *Id*. at 42.

Plaintiff was involved in additional altercations on March 23 or 27, 2017 (*id*. at 30; DN 43-3 at 145), and April 13, 2017 (*id*. at 28), sustaining eye injuries on both occasions. After the April altercation, Defendant Smith ordered Ibuprofen for seven days, a facial x-ray, and "neuro checks." *Id*. at 29.

On June 6, 2017, Plaintiff was taken to the outside neurology consultation who assessed him as having headaches due to "old head trauma" and ordered medication for his headaches and an MRI. *Id*. at 12. Although Plaintiff apparently reported that he had been stabbed in the eye, the neurologist observed that it "was documented as a laceration around the eye" and found that Plaintiff was "neurologically intact." *Id*. The MRI report, dated June 30, was reported as normal. *Id*. at 14.

In November 2017, Plaintiff was sent to the emergency room after he sustained "approx.. 0.5–1 inch laceration to rt. eyebrow" after yet another altercation. *Id*. at 53. In December, Plaintiff returned to the outside neurologist for a follow-up. *Id*. at 50-52.

\* \* \*

Clearly, this is not a case in which Plaintiff received no care for his eye wound; in fact, he received quite a lot of care. Plaintiff admits that, but complains about the type and timing of his care. After his injury, Plaintiff's wound was cleaned, bandaged, and monitored for infection. DN 43 at 3-4, 35, and 38. Defendant Smith prescribed a prophylactic antibiotic the day after the injury, and no infection developed even though Plaintiff refused to take the medication on one day of the five-day regimen. *Id*. at 9, 26, and 32. Defendant Smith examined Plaintiff about two weeks after the injury and referred Plaintiff to an ophthalmologist, who saw Plaintiff within a week. *Id*. at 13 and 40. The ophthalmologist recommended imaging at the primary care physician's or a neurologist's discretion. *Id*. at 13. At Plaintiff's follow-up appointment,

10

Defendant Smith determined that an MRI was not medically indicated. *Id*. at 39. Nevertheless, on February 9, 2017, Smith ordered a neurology consult. *Id*. at 42.

In the meantime, Plaintiff was involved in two more altercations in March and April 2017, during which Plaintiff sustained additional eye injuries before Plaintiff was taken to the outside neurology consultation. *Id*. at 28 and 30; DN 43-3 at 33, 35, 74, 126-27, 134, and 145. The neurologist assessed him as having headaches due to "old head trauma," and ordered medication for his headaches and an MRI, which was done, and which was normal. Plaintiff went back to the neurologist in December 2017 for a follow-up, where the neurologist noted that Plaintiff "is having what appear to me migrainous headaches. This can commonly occur after head trauma." DN 41-1 at 50–52.

Because Plaintiff "received substantial care and challenges the medical judgments of medical professionals," the law requires him to support his allegations with expert testimony. *Phillips*, 2021 WL 4237164, at *8 (citations omitted). Plaintiff has not provided evidence from an expert to show that Defendant Smith provided "grossly incompetent treatment." *Id*. at *7 (citing *Rhinehart*, 894 F.3d at 737; *Jones v. Muskegon, Cty.*, 625 F.3d 935, 945-46 (6th Cir. 2010)). Nor does Plaintiff identify any other evidence indicating Smith was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rhinehart*, 894 F.3d at 737 (citation omitted). For this reason, Defendant Smith is entitled to summary judgment on Plaintiff's claims regarding the adequacy of his care.

Defendant Smith is likewise entitled to summary judgment on Plaintiff's allegation that Smith harmed him by allegedly delaying an MRI. The Sixth Circuit has held that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in

11

medical treatment to succeed." *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks and citation omitted); *see also Phillips*, 2021 WL 4237164, at *9. Plaintiff has presented no evidence—much less expert evidence—that a delay in treatment exacerbated his harm. This "Eighth Amendment claim thus fails for lack of the required expert medical evidence." *Phillips*, No. 20-6226, 2021 WL 4237164, at *9 (because prisoner failed to present evidence showing that a delay in the reassessment of a hematoma in his calf "exacerbated any harm," his Eighth Amendment claim failed "for lack of the required expert medical evidence").

As to Plaintiff's claim that Defendant Smith was deliberately indifferent in refusing to give him his eyeglasses prescription, the record shows that this request had nothing to do with Plaintiff's medical care. Plaintiff asked for his eyeglass prescription so that he could obtain better-looking glasses than the ones the medical department had already provided to him, though Plaintiff thought them "too ugly." DN 43 at 41. This is not a serious medical need. *See Harrison v. Ash*, 539 F.3d at 518. Defendant Smith is entitled to summary judgment on this claim.

### 2. Defendant Bullock

Plaintiff alleges that after his October 13, 2016, injury he should have been sent to the hospital because Defendant Bullock allegedly "determined he needed hospital treatment for his eye socket injury." DN 1 at ¶ 38. According to the complaint, however, Plaintiff "was informed by Nurse Bullock, or other medical staff, that Dr. Smith . . . denied Plaintiff a hospital visit for his eye socket injury." *Id*. at ¶ 41.

Again, Plaintiff's own testimony undermines his claim against Bullock. In his deposition, Plaintiff admitted that he did not know exactly what Defendant Bullock did wrong,

although he did express disappointment that he was not sent to the hospital. DN 41-3 at 11. Plaintiff further stated that Defendant Bullock "helped me above and beyond her duty." *Id*. at 65. He admitted that Defendant Bullock helped him; that it was Defendant Smith who "denied" him a hospital visit; and even that he was not sure what more she could have done to get him a hospital visit. DN 41-3 at 10, 64.

The record undisputedly shows that Defendant Bullock provided care to Plaintiff. Nothing in the record, including Plaintiff's deposition testimony, supports a finding that Defendant Bullock provided care that was grossly incompetent or grossly inadequate. *E.g., Rhinehart*, 894 F.3d at 737. In fact, the record shows that it was not within Defendant Bullock's authority to send him to the emergency room, making it impossible for Plaintiff to demonstrate the subjective component of a deliberate-indifference claim. *See Meyer v. Natole*, No. 1:14-CV-536, 2016 WL 1165976, at *3 (W.D. Mich. Feb. 16, 2016) (finding prisoner could not establish the subjective component because social worker had no authority to prescribe medicine) (and cases cited therein), *report and recommendation adopted*, No. 1:14-CV-536, 2016 WL 1161082 (W.D. Mich. Mar. 23, 2016). Plaintiff also fails to provide any expert medical evidence that a hospital visit was medically necessary in any event. The Court therefore grants summary judgment to Defendant Bullock.

## IV. CONCLUSION AND ORDER

Because the Court concludes that Defendants Bullock and Smith have met their burden to show that Plaintiff has failed to identify any genuine issue of material fact, the Court **GRANTS** their motion for summary judgment (DN 46).[2]

Additionally, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims. *Winkler v. Madison Cty.*, 893 F.3d 877, 905 (6th Cir. 2018) ("Because the district court did not err by granting summary judgment on [plaintiff's] § 1983 constitutional claim, the court properly declined to exercise supplemental jurisdiction over [plaintiff's] state-law claims). The Court dismisses those claims without prejudice.

The Court will enter a separate Judgment.

Date: October 6, 2021

Benjamin Beaton, District Judge
United States District Court

cc:   Plaintiff, *pro se*
      Counsel of record
B213.009

---

[2] Defendants Bullock and Smith also moved to supplement their motion for summary judgement by adding the administrative-exhaustion arguments of the other (dismissed) Defendants. (DN 46). The Court **GRANTS** this motion to supplement but denies as moot the motion for summary judgment on this basis. Because the Court grants the Defendants' motions for summary judgement based on deliberate-indifference grounds, no need remains for resolving the supplemental exhaustion arguments.